# Hendricks v. Manor Care of West Reading, Pa., LLC

C.P. of Berks County, No., 13-2028

*Erica C. Wilson*, for plaintiff.
*Maria R. Granaudo Gesty* for defendants.

SPRECHER, *J.*, Oct. 3, 2014—All defendants appeal the order dated August 25, 2014, and docketed on August 27, 2014, which overruled in part and sustained in part defendants' preliminary objections to plaintiff's complaint. This opinion is filed pursuant to Pa. R.A.P. 1925.

## FACTS

The facts gleaned from the record, including the pleadings and depositions of Esther R. Hendricks, the Plenary Guardian of the person and the estate of Esther Brown, and Beverly Henry, defendants' employee who is Admissions Coordinator for Manor Care of West Reading, PA, LLC., are as follows.

On February 3, 2011, Ms. Brown was admitted to

defendant Manor Care of West Reading, PA, LLC (Manor Care). The remaining defendants own, operate, and/or manage nursing homes, including Manor Care. Plaintiff filed a professional liability action against Manor Care and its corporate owners.

Ms. Brown had a medical history which included dementia, cognitive impairment, depression, agitation, fatigue, weakness, arteriosclerotic heart disease, history of stroke, uncontrolled type II diabetes, and hypertension. She could no longer care for herself and required assistance with her activities of daily living.

Plaintiff's complaint contains six counts: count one — negligence; count two — negligence *per se* for violations of neglect of a care-dependent person, 18 Pa. C.S.A. § 2713; count three — negligence *per se* for violations of the Pennsylvania Older Adults Protective Services Act, 35 P.S. § 10225.101 *et seq*; count four — battery; count five — negligent hiring; and count six (mistakenly numbered count five again) — negligent retention.

The battery account arose from injuries Ms. Brown received from defendants' employees, including an incident on January 5, 2013, which was reported to the West Reading Police Department. A nurse noted that Ms. Brown was lying in bed with blood on her hands and pillowcase. Nurses identified a laceration above Ms. Brown's right eyelid. Ms. Brown was unable to state what had caused her condition, and she was sent to the emergency room at a local hospital. A nursing aide who was present when Ms. Brown was injured reported that Ms. Brown had been combative to another nursing aide who had entered her room to change her brief. That aide held Ms. Brown down, hit her on her arm, and then had thrown a can of shaving cream at Ms. Brown's face, hitting her above the eye. The perpetrator

claimed that she had not hit Ms. Brown on the arm and had accidentally hit her on the face.

Defendants filed preliminary objections to the complaint. Preliminary objection I was a motion to enforce the arbitration agreement (agreement) executed by the parties. Preliminary objections II and III were demurrers/motions to strike counts two and three. Preliminary objection IV was a demurrer/motion to strike all allegations and claims for punitive damages. Preliminary objection V was a motion to strike all allegations of scandalous or impertinent matter.

Ms. Brown died on August 31, 2013. The Register of Wills of Berks County, Pennsylvania appointed plaintiff, Esther R. Hendricks, Ms. Brown's daughter as administratrix of Ms. Brown's estate. On October 29, 2013, this court granted plaintiff's motion to substitute parties and amend the caption to reflect this substitution.

On November 19, 2013, this court ordered that the parties engage in discovery relating to the enforceability of the agreement. The following facts were produced through discovery.

Plaintiff was sixty-three years old when deposed. She obtained a GED in 2007 and a nursing assistant certification in 2006 from Stratford University. Plaintiff never worked as a nursing assistant. In 2009, she retired from a candy factory where she had worked as a machine operator or a packer.

Ms. Brown was living with her plaintiff at the time of her admission to Manor Care. During the day, Ms. Brown attended an adult day care facility which was paid through a waiver from the Berks County Area Office of Aging. On February 3, 2011, the day of Ms. Brown's admission to

Manor Care, Ms. Brown's day nurse waited for her at the bus stop for her return from the day care facility, but Ms. Brown did not disembark. Subsequently, Ms. Brown's caseworker from the office of aging telephoned plaintiff and informed her that Ms. Brown had wanted to go to a nursing home, so the agency had her admitted to Manor Care directly from the adult day care facility. Plaintiff had not spoken to anyone about her mother's admission. Ms. Brown had said that she had not wanted to be a bother to plaintiff.

Upon her admission to Manor Care, Ms. Brown could make her needs known and express what she wanted. She did not have any diagnosis of dementia on February 11, 2011, the date of her admission to Manor Care. Her condition deteriorated during her residency at the facility. As of January 5, 2013, Ms. Brown was diagnosed with dementia.

Ms. Brown signed for her admission to Manor Care on February 3, 2011; she did not sign all of the other necessary paperwork on that day. Plaintiff signed the remaining paperwork, including the agreement, on February 4, 2011. Plaintiff did not have a power of attorney for Ms. Brown, but she thought she had possessed the authority to execute the documents as Ms. Brown's daughter. She does not remember if she had ever told her mother that she had signed any paperwork on her behalf.

Plaintiff does not understand all the terms of the agreement, including the provision that the arbitration is to be administered by the National Arbitration Forum (NAF). She has no recollection of her meeting with the representative of the nursing home.

The parties also deposed Beverly Henry, who has been

employed by defendants since October 2006 as a medical records and admissions coordinator. Ms. Henry has a high school diploma and graduated from LPN school in 1983. Since August 2007, she has been working full-time in the admissions office. The position of admission director requires more training and was vacant on February 3, 2011; Manor Care still does not have this position filled. Ms. Henry received training when she had started her job and obtained additional training by webinars when admissions policies changed. Defendants provided Ms. Henry with two major "talking points" to discuss with families.

The office of aging was the referral source for the admission, so Ms. Henry had asked the case manager if anyone had a power of attorney for Ms. Brown or was available to be the emergency contact or responsible party. This caseworker provided plaintiff's name to Ms. Henry. The case manager had informed her that Ms. Brown had some cognitive issues.

Ms. Henry had met with Ms. Brown upon her arrival at Manor Care. She had Ms. Brown sign the admission document. She found that the patient was agreeable about being at Manor Care, but she had not seemed focused; therefore, she did not present any other documents to her for her signature. She did not explain to Ms. Brown that she was going to ask plaintiff to sign all the other documents.

Ms. Henry met with plaintiff the next day, but she did not have an independent recollection of that meeting. She knows that she met with her to finish the paperwork for Ms. Brown's admission. Ms. Henry believes that she spent approximately forty-five minutes, the customary time period, with plaintiff to complete the paperwork. Ms. Henry never attempted to go back to Ms. Brown to finish

the admission process which consists of a packet of thirty-seven pages.

Henry also testified that there are only four things she highlights in her discussion about the agreement: that the agreement is voluntary; that a traditional court system is not used; that there is a panel of three arbitrators that are either retired judges or lawyers with extensive experience to hear the case; and that arbitration is binding with no appeals. Ms. Henry testified that during the entire time of her employment, she had never read the entire agreement.

Ms. Henry also explained to plaintiff that arbitration is a cost-effective and time-saving method of resolving disputes. Ms. Henry's basis for the belief that arbitration is cost-effective comes from the paragraph in the agreement that states that there are less expenses concerning depositions and employee expenses. Ms. Henry does not know what the NAF is. She further testified that no one can alter or modify the Agreement.

Based on the evidence gleaned from the record, this court overruled preliminary objections I, II, and III, sustained preliminary objection IV without prejudice for plaintiff to refile if further discovery merits a request for punitive damages, and sustained preliminary objection V to scandalous and impertinent matter. Defendants filed a timely appeal to this order.

## ISSUES

Defendants raise the following issues in their concise statement of errors complained of on appeal.

1. Whether this court erred in finding that the agreement was not enforceable even though plaintiff signed the agreement on behalf of her mother, Esther Brown?

2. Whether plaintiff was authorized to sign the agreement by virtue of several theories of agency, including direct, implied or apparent authority, and/or agency by estoppel?

3. Whether plaintiff was authorized to sign the agreement through a theory of estoppel as she had authority to enter into a contingency fee agreement, retain counsel, and commenced litigation?

4. Whether this court erred in finding that plaintiff, as the authorized agent for Esther Brown, did not knowingly and voluntarily waive the right to trial by jury by signing the agreement?

5. Whether this court erred in finding that the agreement was procedurally and substantively unconscionable?

6. Whether this court erred in finding that the unavailability of the National Arbitration Forum (NAF) to administer any arbitration proceedings rendered the agreement unenforceable, even though the agreement provided for alternatives?

7. Whether this court, in refusing to enforce the agreement, violated the provisions of the Federal Arbitration Act (FAA), and U.S. Supreme Court's precedent interpreting the FAA, which strongly favors the arbitration of disputes?

8. Whether this court, in refusing to enforce the agreement, violated the long-standing public policy of the Commonwealth of Pennsylvania favoring the arbitration of disputes?

9. Whether this court erred in refusing to enforce the agreement on grounds of lack of consideration?

10. Whether this court erred in refusing to enforce the

agreement on grounds that it violated state and federal regulations?

11. Whether this court erred in finding that the agreement was unenforceable because it did not provide for a termination date or a terminating event?

## DISCUSSION

This court shall first address the issue of plaintiff's authority to sign the agreement on Ms. Brown's behalf. This court found that defendants did not prove that plaintiff had any authority to sign the agreement.

Ms. Brown never granted a power of attorney to anyone, including plaintiff. The office of aging and defendants deemed Ms. Brown capable of deciding to reside at Manor Care. Plaintiff had no part in making this decision and did not even know about it until after the fact. Ms. Henry had Ms. Brown sign the admission document on the day of her arrival. Thus, Ms. Henry deemed Ms. Brown competent to sign the admission, but she stopped the admission process because Ms. Brown was not focused. Ms. Henry never attempted to have Ms. Brown review the remaining documents at a later date.

The office of aging identified plaintiff as the person who would be able to sign the paperwork if Ms. Brown had not been capable. Thus, a third party, not Ms. Brown, submitted plaintiff as the person authorized to handle the paperwork for Ms. Brown. Ms. Henry did not receive authorization from Ms. Brown to discuss anything, including the agreement, with plaintiff. Ms. Brown did not include plaintiff in making her decision to enter the nursing home. It is clearly evident that Ms. Brown did not direct plaintiff to sign any documents on her behalf. Defendants relied entirely on a statement from the office of

aging caseworker that plaintiff could handle the admission process. Defendants never confirmed this statement with Ms. Brown whom they had deemed competent to sign admission papers.

A person cannot become an agent for a principal without the principal's consent and/or conduct to show express or implied agency. Defendants cannot grant agency to a party because they want to deal with that person instead of the resident. Moreover, plaintiff had nothing to do with Ms. Brown's admittance; therefore, it would appear that Ms. Brown had not wanted her daughter involved in the admission process. For these reasons, this court found that plaintiff had no authority from Ms. Brown to sign anything on her mother's behalf.

Defendants suggest that plaintiff was authorized to sign the agreement through a theory of estoppel because she subsequently entered into a contingency fee agreement, retained counsel, and commenced this litigation. This argument fails. At the time of her admittance to Manor Care, Ms. Brown did not have a diagnosis of dementia. That diagnosis occurred during her residency at Manor Care. After Ms. Brown was diagnosed with dementia and after she was injured by defendants' employee(s), plaintiff retained counsel and through legal proceedings in the Orphans' Court was appointed Ms. Brown's guardian; thus, she had the authority as a guardian to institute these legal proceedings on behalf of Ms. Brown. Her later guardianship does not ratify any prior unauthorized conduct.

Furthermore, this court found that plaintiff did not knowingly and voluntarily waive the right to a jury trial by signing the agreement. Plaintiff testified at her deposition that she had not understood the terms in the agreement (transcript 109). She never read the entire agreement.

Even if plaintiff had read and understood the agreement, there is no evidence that she would have understood the repercussions of and limitation of rights to which she was agreeing. Ms. Henry did not explain the entire agreement with plaintiff. Ms. Henry testified at her deposition that no one can alter or modify the agreement (transcript 74). So even if she did explain the entire agreement to plaintiff, the terms were not negotiable.

An "adhesion contract" is a standard form contract prepared by one party, to be signed by the party in a weaker position, usually a consumer, who has little choice about the terms. A contract or term is unconscionable and therefore avoidable, where there is a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it. *Bayne v. Smith*, 965 A.2d 265 (Pa. Super. 2009). Agreement in the case *sub judice* is an adhesion contract, a take-it-or-leave-it contract, that defendants offer to every resident on the day of the resident's admission.

Defendants' fifth contention is that this court erred in finding that the agreement was procedurally and substantively unconscionable. This complaint is without merit.

Many of the provisions of the agreement are unduly favorable to the defendants, the scriveners of the agreement, and misleading to the residents. The especially grievous provisions are as follows:

A. WHAT IS ARBITRATION?: Arbitration is a cost effective and time saving method of resolving disputes without involving the courts. In using arbitration, the disputes are heard and decided by a private individual called an arbitrator. The dispute will not be heard or decided by a judge or jury.

The plain meaning of this paragraph is that arbitration is certainly beneficial to anyone entering into the agreement. Even the plaintiff wants a "cost-effective and time-saving method." What person would not want to avoid appearing before a judge or jury in a public arena when given the opportunity to appear before a private individual, especially if both time and money can be saved by doing so?

> B. AGREEMENT TO ARBITRATE "DISPUTES": Any and all claims or controversies arising out of or *in any way* relating to this agreement, the admission agreement or any of the patient's stays at this center, or any center operated by any subsidiary of the HCR-Manor Care, Inc., whether or not related to medical malpractice, including but not limited to disputes regarding the making, execution, validity, enforceability, voidability, unconscionability, severability, scope, interpretation, preemption, waiver, or any other defense to enforceability of this agreement or the admission agreement, whether arising out of State or Federal law, whether existing now or arising in the future, whether for statutory, compensatory or punitive damages and whether sounding in breach of contract, tort or breach of statutory duties (including, without limitation except as indicated, any claim based on Patients' Rights or a claim for unpaid center charges), regardless of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted to binding arbitration...

This very long, confusing sentence comprised of 138 words compels the parties in *all* disputed claims, including malpractice cases, to enter into mandatory binding arbitration. Moreover, it binds the patients to arbitration even if they become patients at any time, regardless of the circumstances, at other centers that are operated by any

subsidiary of the HCR Manor Care, Inc.

> B.2. Demand for arbitration shall be made in writing, sent to the other party via certified mail, return receipt requested, and filed with NAF (unless NAF is mutually waived).

This section requires that the demand for arbitration be filed with NAF. NAF no longer hears such cases, so the patient is left in limbo on how to proceed.

> B.7. Waiver of claim: Any claim shall be forever waived if it arose prior to the arbitration hearing and is not presented in such hearing. A claim that is not served within the statute of limitations period applicable to the same claim in a court of law in the state in which this center is located shall be forever waived.

The patient is forever barred from presenting any future claims if not presented at the arbitration hearing. This means that if a breach of contract claim is raised by the nursing home against the patient, any non-breach of contract claim by plaintiff — be it medical malpractice, or any other unrelated claim — is waived, if not heard at the arbitration hearing, even if the claim is a latent or undiscovered defect, error, or omission that comes to fruition after the hearing.

It is one thing for realistically anticipated legal issues to arise between parties in a business transaction that both sides equally want to be mediated or arbitrated. This is a cost effective resolution of expected litigation; but it is entirely different to have an uneducated consumer enter into a contract for nursing services and find, when it is too late that there can arise totally unanticipated issues — medical malpractice, intentional or negligent tort, or

specifically battery, as in the instant matter.

Under the law, every plaintiff has two years from the date of the injury to bring an action in tort. Defendant's unconscionable contract makes that law inapplicable to plaintiff and his/her heirs. Plaintiff may have two years by law to file a lawsuit, but if an arbitration hearing is held well before that two-year period — for whatever dispute involving the parties — any claim that is not raised by the arbitration hearing is waived; it conveniently ignores the Commonwealth's laws on the statute of limitations. Defendant, in essence, enacts its own statute of limitations law, by conveniently ignoring the Commonwealth's statute of limitations laws.

However, on the other hand, the same unconscionable contract, in fact, enforces these very statute of limitation laws when it is beneficial to defendant to do so. As stated before, defendant's boilerplate terms require that the claim is waived if not filed prior to the hearing despite two years to file. But the claim is also waived even if filed prior to the hearing *but after the statute of limitations* law, i.e. if after two years from when the claim arose. Defendant uses the statute of limitations law for both a shield and a sword, whenever it is beneficial to defendant and adverse to plaintiff.

E. RIGHT TO CHANGE YOUR MIND: This agreement may be cancelled by written notice sent by certified mail to the center's administrator within thirty (30) calendar days of the patient's date of admission. If alleged acts underlying the dispute occur before the cancellation date, this agreement shall be binding with respect to those alleged acts. If not cancelled, this agreement shall be binding on the patient for this

and all of the patient's other admissions to the center without any need for further renewal.

Defendant's boilerplate language in this instance requires that when a patient's claim arises on the first day of the admission, and the agreement is cancelled on the second day, the patient is still forced to arbitrate the claim and cannot go to court. In essence, the wording RIGHT TO CHANGE YOUR MIND is not always true even if the agreement is cancelled within thirty days of signing. This also binds the patient not only to his or her current admission to this nursing home, but also to any future admissions to any facility owned by defendants, without the execution of a new Agreement.

> F.3. Benefits of Arbitration: The parties' decision to select arbitration is supported by the potential cost-effectiveness and time-savings offered by selecting arbitration, which seeks to avoid the expense and delay in the court system. The parties recognize that often the patient is elderly and may have a limited life-expectancy, and therefore selecting a quick method of resolution is potentially to a Patient's advantage. The parties agree that the reasons stated above are proper consideration for the acceptance of the agreement.

According to this misleading clause, arbitration is supposed to be fast and cheap without any reference to the time needed for discovery and the money that is needed for legal representation and the payment of the arbitration fees. This provision also tries to inject fear in the patient by suggesting that a court action takes so much longer than arbitration so unless you elect arbitration, the patient may die before his court case could be finished.

The facts in the case before this court are a perfect

example of how misleading this paragraph is. The alleged assault against Ms. Brown occurred in January 2013, the complaint was promptly filed four months later, and Ms. Brown passed away in August 2013 — all within a very short period of seven months. Neither a court trial nor an arbitration hearing logically is able to occur within seven months. Regardless, there is simply no evidence of the accuracy of this representation that arbitration is faster and cheaper than a court of justice. Furthermore, there is absolutely no reason to conclude from any evidence presented that arbitration, rather than court action, will guarantee a quick resolution before the patient dies which is exactly what is represented in this paragraph.

F.5. Binding on Parties & Others: The parties intend that this agreement shall inure to the direct benefit of and bind the center, its parent, affiliates, and subsidiary companies, management companies, executive directors, owners, officers, partners, shareholders, directors, medical directors, employees, successors, assigns, agents, insurers and any entity or person (including health care providers) that provided any services, supplies or equipment related to the Patient's stay at the center, and shall inure to the direct benefit of and bind the patient (as defined herein), his/her successors, spouses, children, next of kin, guardians, administrators, legal representatives, responsible parties, assigns, agents, attorneys, health care proxies, health care surrogates, third party beneficiaries, insurers, heirs, trustees, survivors and representatives, including the personal representatives or executors of his/her estate, any person whose claim is derived through or on behalf of the patient or relates in any way to the patient's stay(s) at this center, or any person

who previously assumed responsibility for providing patient with necessary services such as food, shelter, clothing, or medicine, and any person who executed this agreement or the admission agreement.

This provision binds the parties and anyone remotely related to the parties to the contract forever because it does not provide for a termination date or a terminating event.

F.6. Fees and Costs: The panels' fees and costs will be paid by the center except in disputes over non-payment of center charges wherein such fees and costs will be divided equally between the parties. NAF's administrative fees shall be divided equally among the parties. To the extent permitted by law, any party who unsuccessfully challenges the enforcement of this agreement shall be required to pay the successful parties' reasonable attorney fees and costs incurred to enforce such contract (i.e. motion to compel arbitration). The parties shall bear their own attorney fees and costs in relation to all preparation and attendance at the arbitration hearing, unless the panel concludes that the law provides otherwise. Except as stated above, the parties waive any right to recover attorneys' fees and costs.

This provision attempts to force a patient's family into accepting only the arbitration of any dispute because it threatens that anyone who unsuccessfully challenges the enforcement of the agreement, i.e. the motion to compel arbitration, will be punished by being forced to pay the fees of the successful parties. Thus, if a family member loses, he or she is penalized by being required to pay the fees and costs of the nursing home. These costs could be extremely high. If anyone can think of challenging the defendant's motion to compel arbitration, he or she

will pay the price. If this is not a perfect example of an "agreement" that is nonnegotiable and that is forced down the throat of the family, what is?

> F.7. Confidentiality: The arbitration proceedings shall remain confidential in all respects, including all filings, deposition transcripts, discovery documents, or other materials exchanged between the parties and the panels' award. In addition, following receipt of the panels' award, each party agrees to return to the producing party within 30 days the original and all copies of documents exchanged in discovery and at the arbitration hearing.

This paragraph further protects defendants from bad publicity. Residents may suffer grievous injuries and/or death, but the defendants remain unscathed with the use of arbitration except for paying a portion of the damages. Arbitrations are private between the parties, unlike lawsuits which are opened to the public; therefore, arbitrations will not generate bad publicity for defendants. Some injuries alleged are so egregious that if they are proven, they should be made known publicly; a lack of transparency in critical issues may be against public policy. The consumer has the right to be informed.

This provision further requires that all evidence, "including all copies" that could be used to plead or argue the truth of the actual liability/damages shall be returned to defendant. This continuing secrecy guarantee is very disturbing in any legal proceeding, especially when it is designed to bury all proof of bad things that may be alleged to occur in a nursing home that seeks and obtains patients from the general public.

F. 10. No Jury Trial: If this agreement is found to be

unenforceable and arbitration is not compelled, then as a default, the parties agree that the disputes shall be resolved solely by a judge via a bench trial. Under no circumstances will a jury decide any dispute.

Residents give up fundamental federal and state constitutional rights to a trial by jury that is guaranteed in both the seventh amendment of the United States Constitution and the Pennsylvania Constitution without a full explanation of what they are forsaking. Even if the motion to compel arbitration is denied and the agreement is found to be unenforceable, defendants still want to prohibit jury trials. Defendants are overreaching with this provision. It is like a hand reaching out from the grave which seeks to continue to control the case, even if the contract is a voidable adhesion contract. If the agreement is found invalid, then the resident is entitled to all the rights guaranteed by the United States and Pennsylvania Constitutions, including trial by jury. A nonjury trial provision is, of course, designed to again minimize defendants' exposure of bad publicity to the informed public concerning its errors of commission or omission.

## Conclusion

Neither plaintiff nor Ms. Brown are sophisticated businesspeople or health services workers. Plaintiff's nursing aide certification was obtained online, and she never worked in the health profession. She is sixty-three years old and has a GED. She is retired and formerly worked as a laborer in a candy factory. No evidence was produced that showed plaintiff had the business acumen to negotiate with defendants on an equal footing. Furthermore, there is no evidence that either plaintiff or her mother remotely expected that Manor Care employees would harm Ms. Brown intentionally and negligently. Their expectation was

for a contract that covered the costs paid for the nursing services rendered. Therefore, a negligence action was not foreseeable; no one had informed either one about the earlier deficiencies for which this nursing home was cited.

Arbitration may be fine for monetary issues in business transactions, but injuries caused intentionally or negligently in tort should not be the subject of routine arbitration unless both parties fully and completely negotiated and agreed to the final terms. Unlike contracts where the issues are relatively clear and a breach can be easily identified, negligence issues are not so obvious.

For all of the above reasons, this court found that the agreement in the instant case is unconscionable. The agreement is procedurally unconscionable because it was presented at an emotionally trying time to plaintiff who was stressed with her mother's admission. She basically signed the remaining paper work without any authority as if it were her duty to do so, to finish that which was started by her mother, without her knowledge. It was not plaintiff entering into any agreement; she signed simply as a formality.

There was a great disparity in the bargaining positions between the parties. Plaintiff could not negotiate an agreement. She had to take the agreement as is. Plaintiff testified that she had received calls to come to the nursing home to sign the rest of the documents. In fact, in this case, plaintiff was simply told by Ms. Henry to sign it because Ms. Henry told her she had the authority.

The agreement is substantively unconscionable because it violates public policy. In the case *sub judice*, plaintiff's voluntary waiver of a right to a jury trial is not a knowing waiver. There is no evidence that this plaintiff realized

what she was giving up by waiving a jury trial or even a court proceeding. This plaintiff is not an attorney or a businessperson experienced in the law. This court cannot conclude that plaintiff understood her rights. Therefore, this court concluded that plaintiff lacked informed consent when she agreed to waive the resolution of all future disputes in a court of law in favor of private arbitration.

Defendants contend that this court erred in finding that the unavailability of NAF to administer any arbitration proceedings rendered the Agreement unenforceable even though the agreement provided for alternatives. This complaint is meritless. The alternatives are illusionary. The parties must agree upon an independent entity. Consumers are not in a position to know arbitrators; thus, they must blindly agree to those persons selected by defendants. Moreover, according to section C.5 of the agreement, the code of procedure of the NAF must be applied. This code is not attached to the agreement and must be obtained elsewhere by the consumer.

Defendants also maintain that this court violated policy and state and federal regulations by refusing to enforce the agreement. These assertions are without merit. This court examined *this* agreement pursuant to state common law principles and found that the agreement was unenforceable due to the reasons stated above. This court did not invalidate all nursing home agreements, just this particular agreement between these parties because it breaches basic contract principles and due process.

In accordance with the foregoing opinion, this court submits that defendants' appeal should be denied and its order affirmed.